Emily L. Robinson, Esq. (SBN 285343)
Law Office of Emily L. Robinson
5012 Eagle Rock Blvd.
Los Angeles, CA 90041
Tel: (323) 524-7611
Fax: (323) 524-4001
emily@lawofficeemilyrobinson.com
Counsel for Petitioner

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MIRNA DAMARIZ DE LEON CARDONA, a/k/a MIRNA GOMEZ CARDONA, A 200-627-744,<br><br>Petitioner,<br><br>v.<br><br>MARKWAYNE MULLIN, Secretary, U.S. Department of Homeland Security; ANDRE QUINONES, Acting Field Office Director, Los Angeles Field Office, U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations; DAVID VENTURELLA, Acting Director, U.S. Immigration and Customs Enforcement; F. SEMAIA, Warden, Adelanto ICE Processing Center; DIRECTOR, U.S. Citizenship and Immigration Services; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; and U.S. DEPARTMENT OF HOMELAND SECURITY,<br><br>Respondents. | Case No. ____________________<br><br>**VERIFIED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>IMMIGRATION HABEAS CASE<br><br>Emergency hearing requested |

## I. INTRODUCTION

1. Petitioner Mirna Damariz de Leon Cardona petitions for a writ of habeas corpus under 28 U.S.C. § 2241 challenging Respondents' revocation of the liberty the Government granted her more than fifteen years ago, and their use of her own asylum interview to take it away. DHS paroled Petitioner in February 2011 after an asylum officer found she had a credible fear of persecution. On September 24, 2026, ICE officers handcuffed her at the Tustin asylum office, at the interview USCIS had summoned her to attend, before any interview took place. Petitioner was unlawfully detained for no reason other than her lack of lawful status.

2. The arrest was the last step in a sequence of choices the Government made about Petitioner's case, each with full knowledge of her history. In 2011, DHS released her on parole "pending a final decision in your immigration proceedings." She then pursued asylum in those proceedings for more than a decade. In 2015, while she waited, the asylum office granted asylum to her two older children on the same family facts. In 2022, DHS asked the immigration court to terminate her proceedings as an exercise of prosecutorial discretion, reserving its resources for cases it considered enforcement priorities. Petitioner objected, because she wanted her claim decided. When DHS made that choice, it knew of the two misdemeanor arrests it may now invoke, both since dismissed without conviction; it knew her children had already won asylum on the facts underlying her claim; and it knew she wanted a merits hearing. DHS then imposed no reporting, monitoring, or supervision of any kind.

3. Petitioner appealed the termination and, having been displaced from the court forum, filed her asylum application with the USCIS asylum office, which receipted it in July 2024 as pending since May 2011, and took her place in its backlog. The Board of Immigration Appeals

terminated her appeal on May 1, 2025, without any decision on the merits of her claim. USCIS then summoned her for an interview, cancelled it, rescheduled it, and warned her in writing of consequences if she failed to appear. She appeared as directed, with her husband, her attorney, an interpreter, and 324 pages of supporting evidence, and was taken into ICE custody before the interview began. On September 30, 2026, DHS filed a new Notice to Appear, returning her to the adversarial proceedings it had asked the immigration court to end.

4. Respondents revoked Petitioner's release without notice, a reasoned determination, or a hearing, after DHS itself had sought termination of her proceedings and imposed no supervision, and they did so at a USCIS-scheduled asylum interview. That conduct violates the Due Process Clause of the Fifth Amendment, 8 U.S.C. § 1182(d)(5)(A) and 8 C.F.R. § 212.5(e), the Administrative Procedure Act, and the Fourth Amendment. *See Xiu Qing You v. Nielsen*, 321 F. Supp. 3d 451, 466 (S.D.N.Y. 2018) (rejecting the use of a USCIS interview as the occasion for arrest as a "bait-and-switch" that perverts the benefits process).

5. Petitioner's seven-year-old United States citizen daughter, who turns eight on October 7, 2026, is suffering the loss of her primary caregiver, and Petitioner must now prepare for adversarial removal proceedings while in custody. Petitioner seeks immediate release to the status quo that existed before September 24, 2026: liberty in the community without bond, ICE reporting, SmartLINK, GPS monitoring, or other supervision. She further seeks an order barring re-detention on the same grounds absent advance notice and a hearing before a neutral decisionmaker, and an order requiring preservation of any and all records relating to her arrest and detention, including communications between ICE and USCIS concerning her.

## II. JURISDICTION

6. This Court has jurisdiction under 28 U.S.C. § 2241(c)(3), because Petitioner is in custody in violation of the Constitution and laws of the United States, and under 28 U.S.C. § 1331. *See Zadvydas v. Davis*, 533 U.S. 678, 687 (2001). The Court may grant declaratory and injunctive relief under 28 U.S.C. §§ 2201–2202 and 1651(a), and 5 U.S.C. §§ 702, 704, and 706. Section 702 waives sovereign immunity for Petitioner's claims for nonmonetary relief.

7. Nothing in 8 U.S.C. § 1252 strips this Court of jurisdiction. Petitioner is not subject to any order of removal, and she does not seek review of one. Sections 1252(a)(5) and 1252(b)(9) therefore have no application. Petitioner challenges the lawfulness of her re-detention and the manner in which Respondents revoked her release, which are questions independent of any removal proceeding. *See Jennings v. Rodriguez*, 583 U.S. 281, 293–95 (2018) (plurality opinion); *Zadvydas*, 533 U.S. at 687–88.

8. Section 1252(g) likewise poses no bar. It applies only to the three discrete actions it names: the decision to "commence proceedings, adjudicate cases, or execute removal orders." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999). Petitioner's claims concern her arrest and detention, and Respondents' failure to follow the statute and regulation governing termination of parole. Petitioner does not challenge the commencement of the removal proceedings DHS initiated on September 30, 2026, and none of her claims challenges a decision to commence proceedings, adjudicate a case, or execute a removal order.

## III. VENUE

9. Venue is proper in this District because Petitioner is detained at the Adelanto ICE Processing Center in Adelanto, California, within this District, and her immediate custodian is

located here. *See Rumsfeld v. Padilla*, 542 U.S. 426, 434–35, 442–43 (2004). Venue is also proper under 28 U.S.C. § 1391(e) because Respondents are officers and agencies of the United States and a substantial part of the events giving rise to these claims, including Petitioner's arrest at the USCIS asylum office in Tustin, California, occurred in this District.

**IV. PARTIES**

10. Petitioner Mirna Damariz de Leon Cardona, who appears in EOIR and ICE records as Mirna Gomez Cardona, is a native and citizen of Guatemala who has lived in the United States since January 2011. She is detained at the Adelanto ICE Processing Center.

11. Respondent F. Semaia is the Warden of the Adelanto ICE Processing Center and is Petitioner's immediate physical custodian. He is sued in his official capacity.

12. Respondent Andre Quinones is the Acting Field Office Director of the Los Angeles Field Office of U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations, which made the challenged arrest and custody decisions. He is sued in his official capacity.

13. Respondent David Venturella is the Acting Director of U.S. Immigration and Customs Enforcement and exercises control over persons held in ICE custody. He is sued in his official capacity.

14. Respondent Markwayne Mullin is the Secretary of Homeland Security and is responsible for the administration of the immigration laws, including the operations of ICE and USCIS. He is sued in his official capacity.

15. Respondent Director, U.S. Citizenship and Immigration Services, is responsible for the adjudication of Petitioner's pending asylum application and is sued in an official capacity, designated by title pursuant to Federal Rule of Civil Procedure 17(d).

16. Respondents U.S. Immigration and Customs Enforcement, U.S. Citizenship and Immigration Services, and the U.S. Department of Homeland Security are the federal agencies responsible, respectively, for Petitioner's detention, for her pending asylum application, and for the administration of both.

## V. STATEMENT OF FACTS

### A. Entry, Credible Fear Determination, and Release on Parole

17. Petitioner is a native and citizen of Guatemala, born May 4, 1982. After being encountered on or about December 20, 2010, and returned to Mexico, she arrived at the San Ysidro, California port of entry on January 21, 2011. DHS detained her, found her inadmissible, processed her for expedited removal under 8 U.S.C. § 1225(b)(1), and referred her for a credible fear interview. Ex. B (Parole Document).

18. Petitioner's credible fear account described violence directed at her family because of her father's community leadership. Gang members entered the family home and raped Petitioner and her sister, and shot Petitioner's mother, who survived. In response, Petitioner's father and other community members organized to advocate for people harmed by the gang, and his efforts helped put a gang member known as El Vava in prison for three years. After his release, El Vava and his associates sought revenge against the family. They threatened Petitioner's father, targeted his children in order to punish him and force him to abandon his community work, and killed his second-in-command. Petitioner fled to the hills to avoid being killed.

19. The asylum officer found a significant possibility that Petitioner's claim could be found credible in a full hearing and that she could establish persecution on account of her membership in the particular social group of her father's immediate family. The officer found that her family relationship is immutable, that it was known in the community, and that the gang had targeted her directly to punish her father and compel him to resign his community position.

20. Following the positive credible fear determination, DHS issued a Notice to Appear dated February 9, 2011, designating Petitioner an arriving alien, charging her under 8 U.S.C. § 1182(a)(7)(A)(i)(I), and noting that it was issued after an asylum officer found a credible fear of persecution or torture. Ex. A (Notice to Appear). In requesting parole, Petitioner told DHS that she would live with her aunt and would be present for every court hearing. On February 28, 2011, after approximately five weeks in custody, DHS approved her release. The letter, signed by Field Office Director Timothy S. Robbins, states that "after review of all the facts in this case, it has been determined that your request for release on parole pending a final decision in your immigration proceedings be approved." It states no expiration date and imposes no other condition. Ex. B.

**B. More Than a Decade Pursuing Asylum; Her Children's Asylum Grants**

21. Petitioner filed her application for asylum and withholding of removal in her removal proceedings on May 3, 2011. Ex. C (USCIS Receipt dated May 3, 2011). For more than eleven years she pursued that application through the immigration court, never missed a hearing, and presented for biometrics whenever required. Once eligible, she obtained employment authorization and has maintained it continuously for more than a decade, undergoing biometric and background screening with each renewal.

22. Petitioner's two Guatemalan-born children came to the United States separately, after her. They too suffered the violence directed at the family: her son was beaten so severely that he nearly died, and her daughter was present. On April 1, 2015, while Petitioner's own application remained pending in immigration court, the USCIS asylum office granted both children asylum based on the same facts and circumstances underlying Petitioner's claim. Her son is now a lawful permanent resident, and her daughter has naturalized as a United States citizen.

23. Petitioner's youngest daughter was born in the United States on October 7, 2018, and is a United States citizen. She is seven years old, turns eight on October 7, 2026, and depends on Petitioner as her primary caregiver. Petitioner and her husband reconciled several years ago and live together; he regards her youngest daughter as his own child and is a derivative on Petitioner's pending asylum application.

**C. DHS Terminates Her Proceedings Over Her Objection**

24. On July 27, 2022, the Van Nuys immigration judge dismissed Petitioner's removal proceedings without prejudice on the basis of "DHS's prosecutorial discretion." Ex. D (Order of the Immigration Judge). The order cites 8 C.F.R. § 239.2(c) and (a)(7). The latter provision authorizes DHS to seek dismissal where "[c]ircumstances of the case have changed after the notice to appear was issued to such an extent that continuation is no longer in the best interest of the government." 8 C.F.R. § 239.2(a)(7). DHS thus represented to the immigration court that continuing to pursue Petitioner's removal was not in the Government's interest, a judgment reflecting that she was not a person whose removal warranted the Government's enforcement resources.

25. Petitioner did not seek that outcome; she objected because she wanted the asylum claim she had pursued for more than eleven years decided on its merits. She reserved appeal at the hearing and timely appealed the dismissal to the Board of Immigration Appeals, which received her appeal on August 11, 2022. Ex. E (BIA Filing Receipt dated August 15, 2022).

26. When DHS sought dismissal, it had before it Petitioner's complete history. It knew that the asylum office had granted asylum to her two older children in 2015 on the same family facts and that she wanted a merits hearing. And, according to the attorneys who represented Petitioner in those proceedings, DHS knew of the only two contacts Petitioner has ever had with the criminal justice system, both misdemeanor prosecutions that ended without conviction:

(a) A case filed November 22, 2016, charging misdemeanor violations of California Penal Code §§ 273.5(a) and 243(e)(1), arising from a dispute with her husband during a period of separation. The prosecution did not proceed, and the court dismissed the case on March 7, 2017, under Penal Code § 1382.

(b) A case filed January 6, 2021, charging misdemeanor violations of California Penal Code §§ 273.5(a) and 273a(b), arising from an argument with the father of her youngest daughter. Petitioner disputed the charges, retained counsel, and demanded a jury trial. The court dismissed the case on July 18, 2022, after the prosecution was unable to proceed.

27. Both prosecutions had been dismissed before the immigration judge granted DHS's motion, and there has been no arrest, charge, or other law enforcement contact of any kind since. Since her release on parole in 2011, Petitioner has had no ICE check-in or supervision obligations: DHS imposed no ERO reporting, SmartLINK or electronic monitoring, alternatives-to-detention

enrollment, or other supervision before or after the dismissal, and immediately before September 24, 2026, she lived in the community without any ICE supervision.

**D. She Refiles With the Asylum Office and Waits**

28. Displaced from the court forum in which she had sought asylum since 2011, Petitioner filed her asylum application with the USCIS asylum office. On July 15, 2024, USCIS issued a receipt notice acknowledging that her complete application "was received and is pending as of 05/05/2011." Ex. F (I-589 Receipt and Biometrics Notices). By USCIS's own records, then, her asylum application has been pending for more than fifteen years. USCIS scheduled her biometrics for August 6, 2024, advising that her biometrics would be used, among other things, to check FBI criminal history records, and Petitioner appeared as required. *Id.* When the annual asylum fee came due, she paid it; USCIS issued its receipt on November 5, 2025. Ex. G (Annual Asylum Fee Receipt). Her application then waited in the asylum office's backlog for two more years.

29. On May 1, 2025, the Board of Immigration Appeals terminated Petitioner's appeal. Ex. J (EOIR Automated Case Information). No immigration judge, Board member, or asylum officer has ever adjudicated the merits of her claim.

**E. USCIS Summons Her to an Interview**

30. By notice dated July 8, 2026, USCIS scheduled Petitioner's asylum interview for August 20, 2026. Ex. H (August 20 Interview Notice). That notice warned: "If you fail to appear for your interview without good cause, this may result in the immediate dismissal of your asylum application or, if you are not in legal status, you may be placed in removal proceedings and your application may be referred to an immigration judge." *Id.* USCIS then cancelled the interview without explanation and issued a Form I-797C Interview Reschedule Notice, dated August 21,

2026, directing Petitioner to appear at the asylum office at 14101 Myford Road, Tustin, California, on Thursday, September 24, 2026, at 7:30 a.m. Ex. I (Reschedule Notice). The notice identifies Petitioner by name and A-number, identifies the matter as her application for asylum and withholding of removal, and directed her husband, as a derivative, to attend as well.

31. The reschedule notice apologizes for the inconvenience of the cancellation and warns that failure to appear without good cause may result in referral of the application to an immigration judge and loss of eligibility for employment authorization based on the pending application. Ex. I. Petitioner's continued pursuit of asylum and her ability to work thus depended on her appearance. Under the terms of USCIS's own notice, the consequence of non-appearance was potential referral to an immigration judge; Petitioner appeared as directed and was taken into ICE custody.

32. Petitioner prepared for the interview with counsel, who submitted approximately 324 pages of supplemental evidence in support of her claim.

**F. The September 24, 2026 Arrest**

33. On September 24, 2026, Petitioner arrived at the Tustin asylum office as directed, with her husband, her attorney Lorena Larios Shah, and an interpreter, and checked in. After approximately one to one and a half hours, they were called to window eight, where USCIS personnel confirmed the identities of Petitioner and her husband.

34. The employee at the window then said that they would be going with "the officer behind you." Ms. Larios Shah, expecting to be taken to the interview on the second floor, agreed. The employee directed Petitioner, Ms. Larios Shah, and the interpreter to follow the officer and instructed Petitioner's husband to wait in the lobby. The officer, who wore no ICE insignia, led

them not upstairs but through a door at the back of the lobby into a conference room where approximately three or four ICE officers were waiting, at least two wearing ICE insignia.

35. The officers asked Petitioner her name and date of birth and announced that they would detain her. When Ms. Larios Shah asked on what ground, the officers said Petitioner was in the United States without legal status. Ms. Larios Shah asked whether they had a warrant; an officer said they did, but when she asked to see it, he could not find it in the paperwork. The officers then handcuffed Petitioner before any asylum interview took place.

36. Ms. Larios Shah explained that Petitioner had passed her credible fear interview, been released on parole, appeared for every hearing, pursued asylum for more than a decade, objected to and appealed the dismissal of her proceedings, and was present that morning for the asylum interview USCIS had scheduled. She explained that Petitioner has a young United States citizen daughter and is now eligible for cancellation of removal. One officer asked questions about the child and called a supervisor, then returned minutes later and said they had to take her. When Ms. Larios Shah repeatedly asked under what authority, the officers repeated only that Petitioner was in the United States unlawfully; they identified no violation, no new offense, no missed appearance, no flight risk, and no danger.

37. Ms. Larios Shah asked to speak with Petitioner privately before she was taken, but the officers refused and required any conversation to occur in their presence. Ms. Larios Shah advised Petitioner not to sign anything and to contact counsel or family as soon as she could. Petitioner's husband, a derivative on the same application who attended the same appointment, was not detained.

**G. Denial of Release and Continuing Detention**

38. Officers told Ms. Larios Shah that Petitioner would be taken to ICE in Santa Ana. The same day, Ms. Larios Shah presented ICE with a written request for Petitioner's release, prepared with attorney Nikhil Shah, and reiterated orally why the detention was unlawful. Officers had not read the request; they told her that a supervisor would deny it, that Petitioner would be transferred to Adelanto, and that a Notice to Appear had already been issued. Ms. Larios Shah was not given a copy of any Notice to Appear.

39. Petitioner received no written notice of any termination of her parole, no statement of reasons, and no hearing before a neutral decisionmaker, either before or after her arrest.

40. As of September 25, 2026, EOIR's automated case information reflected only the July 27, 2022 dismissal, the May 1, 2025 termination of the appeal, and no future hearings. Ex. J. On September 30, 2026, six days after her arrest, DHS filed a new Notice to Appear with the immigration court, and Petitioner is scheduled for a master calendar hearing on October 6, 2026. Petitioner is not subject to any order of removal.

41. After Petitioner's detention, the asylum office sent her a notice cancelling her asylum interview. Ex. L (Interview Cancellation Notice). Petitioner remains detained at the Adelanto ICE Processing Center, where ICE lists her as Mirna Gomez Cardona. Ex. K (ICE Detainee Locator). Her youngest daughter remains separated from her mother, and her asylum application, pending for more than fifteen years in one forum or another, remains unadjudicated.

## VI. EXHAUSTION

42. Counsel requested Petitioner's release at the asylum office and in writing to ICE on the day of her arrest, and an ICE supervisor denied the request. No further administrative remedy is available or adequate.

43. Exhaustion under 28 U.S.C. § 2241 is prudential, not jurisdictional, and is excused where administrative remedies are inadequate or futile or where requiring them would cause irreparable injury. *Ward v. Chavez*, 678 F.3d 1042, 1045 (9th Cir. 2012); *Laing v. Ashcroft*, 370 F.3d 994, 1000 (9th Cir. 2004); *Hernandez v. Sessions*, 872 F.3d 976, 988 (9th Cir. 2017). Each ground applies here: because DHS designated Petitioner an arriving alien, the regulations deny an immigration judge authority to redetermine her custody, 8 C.F.R. § 1003.19(h)(2)(i)(B), and a further request to the agency that ordered her detention is not review by a neutral decisionmaker.

44. Moreover, a bond hearing is the wrong remedy for the injury alleged. Petitioner's claim is that her liberty was revoked without the notice, reasoned determination, and pre-deprivation hearing the Constitution and regulations require. A post-deprivation bond hearing cannot supply process that was due before the deprivation, and it would recast the question as a discretionary custody assessment rather than a review of whether the Government lawfully revoked her release at all. *See Tang v. Mullin*, No. 5:26-cv-04881-KES, slip op. at 10–12 (C.D. Cal. Sept. 10, 2026), ECF No. 9; *Yu v. Giles*, No. 5:26-cv-04692-MBK, slip op. at 9–10 (C.D. Cal. Aug. 21, 2026), ECF No. 12.

## VII. LEGAL FRAMEWORK

### A. Release From Immigration Custody Creates a Protected Liberty Interest

45. The Due Process Clause protects "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Hernandez*, 872 F.3d at 990 (quoting *Zadvydas*, 533 U.S. at 693). "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690. "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987).

46. Once the Government releases a person from custody, the liberty she then enjoys is protected. Release allows a person "to be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life." *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972). The released person "has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions," and revocation "inflicts a 'grievous loss.'" *Id.* "By whatever name, the liberty is valuable and must be seen as within the protection of the Fourteenth Amendment." *Id. See also Young v. Harper*, 520 U.S. 143, 147–49 (1997); *Gagnon v. Scarpelli*, 411 U.S. 778, 781–82 (1973).

47. These principles apply fully to release from civil immigration custody. "Given the civil context, [the] liberty interest [of noncitizens released from custody] is arguably greater than the interest of parolees in *Morrissey*." *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 970 (N.D. Cal. 2019). "[E]ven when ICE has the initial discretion to detain or release a noncitizen pending removal proceedings, after that individual is released from custody she has a protected liberty interest in

remaining out of custody." *Pinchi v. Noem*, 792 F. Supp. 3d 1025, 1032 (N.D. Cal. 2025). Courts have applied this principle specifically to noncitizens paroled under 8 U.S.C. § 1182(d)(5)(A). *Fernández López v. Wofford*, No. 1:25-cv-01226-KES-SKO, 2025 WL 2959319, at *4 (E.D. Cal. Oct. 17, 2025); *Abduraimov v. Andrews*, No. 1:25-cv-00843-EPG, 2025 WL 2912307, at *6 (E.D. Cal. Oct. 14, 2025); *Noori v. Larose*, 2025 WL 2800149, at *10 (S.D. Cal. Oct. 1, 2025); *Garcia v. Andrews*, No. 1:25-cv-01006-JLT-SAB, 2025 WL 2420068, at *11 (E.D. Cal. Aug. 21, 2025); *Valencia Zapata v. Kaiser*, No. 25-cv-07492-RFL, 2025 WL 2578207, at *3 (N.D. Cal. Sept. 5, 2025) (order granting TRO). That interest does not lapse with the formal term of a parole document. *Ramirez Tesara v. Wamsley*, 2025 WL 2637663, at *3 (W.D. Wash. Sept. 12, 2025).

48. The label attached to the release does not control. For due process purposes, courts treat parole under § 1182(d)(5)(A) and release on recognizance alike: in each, the Government chose to release a person into the community, and the person built a life on that choice. Petitioner's liberty was functionally indistinguishable from release on her own recognizance, and in one respect stronger: after DHS terminated her proceedings, it imposed no conditions at all, so there was nothing she could have violated. In this District, the absence of any supervision order did not defeat the liberty interest of a noncitizen the Government knowingly allowed to remain in the community while she pursued asylum. *Tang*, slip op. at 7–11.

**B. A Mandatory-Detention Theory Does Not Answer These Claims**

49. Respondents may contend that because DHS designated Petitioner an arriving alien in 2011, her detention is governed by 8 U.S.C. § 1225(b), and that parole was her only avenue of release. Even accepting that premise, it does not answer Petitioner's claims. First, the parole statute that authorized her release also governs how that release may end, and the implementing regulation

prescribes the determination and notice required. 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.5(e)(2)(i). Second, whatever statute supplies custody authority, the Due Process Clause governs how the Government may take away liberty it has already granted. *Fernández López*, 2025 WL 2959319, at *4–8 (holding that asserted § 1225 authority did not extinguish the liberty interest of an arriving alien paroled into the United States and later re-detained).

50. *DHS v. Thuraissigiam*, 591 U.S. 103 (2020), and *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953), are not to the contrary. Each concerned a noncitizen's rights regarding admission, asserted by a person who had never been released into the United States. Neither addressed the revocation of long-standing liberty the Government had granted. Courts have repeatedly held that *Thuraissigiam* does not preclude due process protection for applicants for admission who were released and later re-detained. *See, e.g.*, *Paz Aguilera v. Albarran*, No. 1:25-cv-01619-JLT-SAB, 2025 WL 3485016, at *14 (E.D. Cal. Dec. 4, 2025); *E.A.P.C. v. Wofford*, No. 1:25-cv-01546-JLT-CDB, 2025 WL 3289185, at *10 (E.D. Cal. Nov. 25, 2025); *M.V.I. v. Andrews*, No. 1:25-cv-01440-JLT-SKO, 2025 WL 3154403, at *10 (E.D. Cal. Nov. 12, 2025); *Noori*, 2025 WL 2800149, at *10.

**C. Parole May Be Terminated Only Through the Determination the Law Requires**

51. The INA authorizes parole "temporarily under such conditions as [the Secretary] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit," and provides that the parolee shall be returned to custody "when the purposes of such parole shall . . . have been served." 8 U.S.C. § 1182(d)(5)(A). The implementing regulation provides that, apart from departure or expiration of the authorized period, parole may be terminated only "upon accomplishment of the purpose for which parole was authorized or when in the opinion

of one of the officials listed in paragraph (a) of this section, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States," and that termination "shall be accomplished by written notice to the alien." 8 C.F.R. § 212.5(e)(2)(i).

52. An agency must follow the regulations that govern its exercise of discretion, particularly those protecting individual rights. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267–68 (1954); *Sameena Inc. v. U.S. Air Force*, 147 F.3d 1148, 1153 (9th Cir. 1998). A re-detention unsupported by the determination § 212.5(e)(2)(i) requires is unlawful. *Y-Z-L-H v. Bostock*, 792 F. Supp. 3d 1123, 1144–47 (D. Or. 2025).

**D. The Government May Not Weaponize a Required Immigration Appointment**

53. The APA requires courts to set aside agency action that is arbitrary, capricious, contrary to law, or taken without required procedure. 5 U.S.C. § 706(2)(A), (D). A court must examine "the reasons for agency decisions—or, as the case may be, the absence of such reasons." *Judulang v. Holder*, 565 U.S. 42, 53 (2011). An agency changing position must acknowledge the change and account for serious reliance interests engendered by its prior policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Post hoc rationalizations cannot substitute for contemporaneous reasoning. *Arrington v. Daniels*, 516 F.3d 1106, 1112–13 (9th Cir. 2008).

54. Congress permits any person physically present in the United States to apply for asylum. 8 U.S.C. § 1158(a)(1). In *You*, DHS invited a noncitizen to a USCIS interview and arrested him there. The court held that the Government had used a benefits process "as a sword when it was intended to be used as a shield," rejected "arrest and detention practices predicated on manipulating the laws that Congress has passed," and explained that Congress did not intend its process "to become a mechanism for 'gotcha' law enforcement," warning that "bait-and-switch tactics are not

only a perversion of the statute, but also likely offensive to the concept of ordered liberty." 321 F. Supp. 3d at 466.

**E. The Fourth Amendment Prohibits Re-Arrest Without New Cause**

55. The Fourth Amendment prohibits repeated seizures on the same cause. "It is axiomatic that seizures have purposes. When those purposes are spent, further seizure is unreasonable. . . . Further seizure requires a court order or new cause; the original probable cause determination is no justification." *Williams v. Dart*, 967 F.3d 625, 634 (7th Cir. 2020) (cleaned up). In the immigration context, a person previously released from custody may not be re-arrested "solely on the ground that he is subject to removal proceedings" without some new, intervening cause. *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1196 (N.D. Cal. 2017), *aff'd sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018). Permitting otherwise invites "harassment by continual rearrests." *United States v. Holmes*, 452 F.2d 249, 261 (7th Cir. 1971).

**VIII. CLAIMS FOR RELIEF**

**COUNT ONE**

**Violation of the Fifth Amendment: Procedural Due Process**

56. Petitioner incorporates the preceding paragraphs as though fully set forth herein.

57. Petitioner's parole and more than fifteen years of actual liberty created a protected interest in remaining free from physical confinement. The Government's own subsequent choices deepened that interest: DHS allowed her to pursue asylum at liberty for more than eleven years, sought termination of her proceedings on the ground that she was not an enforcement priority, and then imposed no conditions of any kind. Respondents revoked that liberty without advance notice,

without a statement of reasons, and without any opportunity to be heard before a neutral decisionmaker.

58. "The root requirement of the Due Process Clause" is "that an individual be given an opportunity for a hearing *before* he is deprived of any significant protected interest." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985); *Zinermon v. Burch*, 494 U.S. 113, 127 (1990). "[T]hat the Government may believe it has a valid reason to detain [a] petitioner does not eliminate its obligation to effectuate the detention in a manner that comports with due process." *E.A. T.-B. v. Wamsley*, 2025 WL 2402130, at *4 (W.D. Wash. Aug. 19, 2025).

59. Each *Mathews* factor requires pre-deprivation process. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). The private interest is the most fundamental the Due Process Clause protects, "the interest in being free from physical detention by one's own government." *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004). It is heightened here by fifteen years of liberty, lawful employment, and family life, and by the dependence of her seven-year-old citizen daughter, who is now suffering the loss of her primary caregiver.

60. The risk of erroneous deprivation was high and the value of added process substantial. Respondents relied solely on Petitioner's lack of lawful status, a circumstance unchanged since DHS paroled her in 2011 and since DHS itself sought termination of her proceedings in 2022. They identified no new offense, missed appearance, violation, flight risk, or danger. Counsel presented Petitioner's history on the spot; officers repeated the same status rationale. "ICE had previously determined Petitioner[] not to pose a risk under those criteria, and communicated no basis under those statutory purposes for arresting Petitioner[]. In these circumstances, the risk of erroneous deprivation appears high." *Valencia Zapata*, 2025 WL 2578207, at *3.

61. The Government's interest in dispensing with process was negligible. USCIS set the appointment weeks in advance at a government facility; Respondents knew exactly where and when Petitioner would be, had fifteen years of evidence that she appears when told to, and faced nothing that prevented notice and a hearing. "Any governmental interest of efficient administration of immigration laws . . . does not outweigh" the first two factors. *Noori*, 2025 WL 2800149, at *11. Because the Government initiated the re-detention, it "should be required to bear the burden of providing a justification for the re-detention." *Garcia*, 2025 WL 2420068, at *13.

62. Due process therefore required advance written notice and a hearing before a neutral decisionmaker at which Respondents bore the burden of proving, by clear and convincing evidence, that Petitioner poses a danger or flight risk that no less restrictive alternative could address. *Pinchi*, 792 F. Supp. 3d at 1036–38; *Fernández López*, 2025 WL 2959319, at *8; *Singh v. Holder*, 638 F.3d 1196, 1203 (9th Cir. 2011). No such process occurred, and courts in this Circuit have ordered release on that basis. *See, e.g.*, *Hakim v. Noem*, No. 5:26-cv-00145-CV, 2026 WL 252493 (C.D. Cal. Jan. 22, 2026); *David G.M. v. Chestnut*, No. 1:26-cv-00369-TLN-CSK (E.D. Cal. Jan. 17, 2026) (order granting TRO); *Pablo Sequen v. Albarran*, No. 25-cv-06487-PCP, 2025 WL 2935630 (N.D. Cal. Oct. 15, 2025). A post-deprivation bond hearing, even if available, could not cure the omission. *Tang*, slip op. at 10–12; *Yu*, slip op. at 9–10.

**COUNT TWO**

**Violation of the Fifth Amendment: Substantive Due Process**

63. Petitioner incorporates the preceding paragraphs as though fully set forth herein.

64. Civil detention must bear a reasonable relation to a legitimate, nonpunitive purpose, and the only legitimate purposes of immigration detention are ensuring appearance and protecting

the community. *Zadvydas*, 533 U.S. at 690–92; *Jackson v. Indiana*, 406 U.S. 715, 738 (1972). The Due Process Clause protects against "the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). Executive action that "shocks the conscience" violates substantive due process. *Id.* at 846–47; *Rochin v. California*, 342 U.S. 165, 172 (1952). Where officials have the opportunity for actual deliberation, deliberate indifference meets that standard. *Lewis*, 523 U.S. at 851–53.

65. Petitioner's detention serves neither legitimate purpose: she has appeared for every hearing and appointment for fifteen years, including the one at which she was arrested, and she has no criminal conviction. Both prosecutions known to DHS were dismissed before the immigration judge granted DHS's motion to dismiss her proceedings, and there has been no law enforcement contact since.

66. The Government manufactured the circumstances it now invokes. It released Petitioner pending a final decision in her proceedings; it then prevented that decision by seeking termination of those proceedings over her objection, while knowing her children had already been granted asylum on the same facts; it left her to restart her claim in the asylum office backlog; and it then used her compliance with the asylum office's summons, which warned of adverse consequences for non-appearance, as the occasion to detain her. USCIS's own interview notice identified potential referral to an immigration judge as the consequence of non-appearance; Petitioner appeared as directed and was detained, and DHS then filed a new Notice to Appear returning her to the proceedings it had asked the immigration court to end. The Government cannot create the very posture it relies on to justify detention, and moving a person between forums and priority categories to suit shifting enforcement preferences, then detaining her at the appointment she was

required to attend, is arbitrary government action the Due Process Clause forbids. *See You*, 321 F. Supp. 3d at 466.

67. The manner of Petitioner's detention independently shocks the conscience. Respondents had the opportunity for actual deliberation at every step. USCIS cancelled and rescheduled the interview and directed Petitioner and her husband to appear at a set time and place. At the appointment, staff sent her husband to wait in the lobby and routed Petitioner through a rear door to ICE officers waiting in a conference room. She was handcuffed before the interview began, denied a private consultation with her attorney, and taken into custody after a supervisor overrode an officer who had inquired about her child. Her husband, a derivative on the same application who attended the same appointment, was not detained. Detention effected in this manner, of the primary caregiver of a seven-year-old child, with no criminal conviction and more than fifteen years of compliance, after DHS represented to the immigration court that continuing her case was not in the Government's interest, and for no reason other than her lack of lawful status, reflects at minimum deliberate indifference to Petitioner's liberty and her child's welfare and shocks the conscience. *See Lewis*, 523 U.S. at 846–53; *Chhoeun v. Marin*, 306 F. Supp. 3d 1147, 1160–61 (C.D. Cal. 2018) (recognizing due process limits on arbitrary immigration detention). Petitioner's seven-year-old daughter is suffering the loss of her primary caregiver as a direct result.

**COUNT THREE**

**Unlawful Termination of Parole**

**8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.5(e); *Accardi* Doctrine; 5 U.S.C. § 706(2)(A), (C), (D)**

68. Petitioner incorporates the preceding paragraphs as though fully set forth herein.

69. DHS paroled Petitioner "pending a final decision in [her] immigration proceedings," but there has never been a final decision on her claim. The proceedings ended because DHS chose to end them, over her objection and without any adjudication of the merits, and the Board terminated her appeal without reaching them. The purpose of her parole, to permit her to pursue protection until a final decision, has not been accomplished; DHS itself prevented its accomplishment. And the assurance on which DHS granted parole, that she would appear at every hearing, she honored for eleven years.

70. Respondents terminated Petitioner's parole by arresting and detaining her without the determination § 1182(d)(5)(A) and § 212.5(e)(2)(i) require and without written notice. No authorized official found that the purpose of her parole had been served or that neither humanitarian reasons nor public benefit warranted her continued presence. "Respondents offer no evidence that any authorized official found Petitioner to be a flight risk or a danger to the public. Nor is there evidence that such an official found that humanitarian reasons do not warrant Petitioner's presence in the United States." *Y-Z-L-H*, 792 F. Supp. 3d at 1145. The same is true here, and Petitioner's unresolved claim, her children's asylum grants on the same facts, her compliance, and her citizen daughter's dependence on her all bear directly on the humanitarian and public-benefit determination no one made.

71. Service of a charging document may in some circumstances supply written notice, but it cannot substitute for the substantive determination the regulation requires. Respondents' failure to make that determination violates the statute, the regulation, and the *Accardi* doctrine, and renders the termination contrary to law, in excess of statutory authority, and without observance of procedure required by law. 5 U.S.C. § 706(2)(A), (C), (D).

## COUNT FOUR

**Arbitrary and Capricious Agency Action, 5 U.S.C. § 706(2)(A)**

72. Petitioner incorporates the preceding paragraphs as though fully set forth herein.

73. Respondents' decision to revoke Petitioner's release and detain her, confirmed by the supervisory denial of counsel's written release request, is final agency action: it consummated the agency's custody decision and produced immediate legal consequences. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

74. That decision reversed the agency's prior determinations without explanation. Petitioner's lack of lawful status does not supply a reasoned explanation, because it is unchanged from when DHS paroled her, throughout eleven years of proceedings, and when DHS sought termination of her proceedings as not in the Government's interest. *Judulang*, 565 U.S. at 53. Respondents failed to consider the relevant factors, including the credible fear finding, her unresolved claim, the grants of asylum to her children on the same facts, fifteen years of compliance, the dismissal of both misdemeanor prosecutions before DHS's own representation that continuing her case was no longer in the Government's interest, USCIS's own FBI background checks in 2024, her pending affirmative application, her eligibility for cancellation of removal, and her citizen daughter's dependence on her care. They ignored the reliance engendered by years of unsupervised release and by the Government's own direction that she pursue her claim before the asylum office. *Fox Television Stations*, 556 U.S. at 515.

75. Respondents also used the asylum interview, a required step in the process Congress established, as the instrument of arrest, frustrating the very adjudication USCIS had summoned her to attend. *You*, 321 F. Supp. 3d at 466. Any explanation Respondents develop in litigation cannot

cure the absence of contemporaneous reasoning, *Arrington*, 516 F.3d at 1112–13, and the decision must be set aside.

**COUNT FIVE**

**Violation of the Fourth Amendment: Unreasonable Seizure**

76. Petitioner incorporates the preceding paragraphs as though fully set forth herein.

77. DHS took Petitioner into custody in 2011, determined she should be released, and released her. The only ground Respondents stated for seizing her again in 2026 was that she lacks lawful status, the same ground that existed in 2011, throughout her proceedings, and when DHS itself sought termination of those proceedings. Respondents identified no new, intervening cause: no new offense, no violation, no missed appearance, and no change in circumstances.

78. A re-arrest on the identical ground on which the Government previously released a person, without new cause, is unreasonable. *Williams*, 967 F.3d at 634; *Saravia*, 280 F. Supp. 3d at 1196. The seizure of Petitioner at the asylum interview she was summoned to attend, and her continued detention, violate the Fourth Amendment.

## IX. PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully requests that this Court:

(1) Assume jurisdiction over this matter and issue an expedited order to show cause;

(2) Grant the writ of habeas corpus and order Petitioner's immediate release from custody;

(3) Restore Petitioner to her condition before September 24, 2026, without bond, ICE reporting, SmartLINK or other electronic monitoring, GPS monitoring, alternatives-to-detention enrollment, or other supervision;

(4) Declare that Petitioner's arrest and detention violate the Fifth and Fourth Amendments, 8 U.S.C. § 1182(d)(5)(A), 8 C.F.R. § 212.5(e), and the Administrative Procedure Act;

(5) Set aside Respondents' termination of Petitioner's parole under 5 U.S.C. § 706(2)(A), (C), and (D);

(6) Enjoin Respondents from re-detaining Petitioner absent reasonable advance written notice of the specific factual basis for re-detention and a hearing before a neutral decisionmaker at which Respondents bear the burden of proving by clear and convincing evidence that Petitioner poses a danger or flight risk that no less restrictive condition can address;

(7) Enjoin Respondents from transferring Petitioner outside this District pending final resolution of this matter;

(8) Order Respondents to return Petitioner's employment authorization document and any identity documents taken from her;

(9) Order Respondents to preserve any and all records relating to Petitioner's September 24, 2026 arrest and detention, including all communications between U.S. Immigration and Customs Enforcement and U.S. Citizenship and Immigration Services, including the Los Angeles Asylum Office, concerning Petitioner;

(10) Award costs and reasonable attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

(11) Grant such other relief as the Court deems just and proper.

Dated: October 2, 2026

Respectfully submitted,

/s/ Emily L. Robinson
Emily L. Robinson
Counsel for Petitioner

**VERIFICATION PURSUANT TO 28 U.S.C. § 2242**

I, Emily L. Robinson, declare as follows:

I am an attorney admitted to practice in the State of California and counsel for Petitioner. Because Petitioner is detained, I make this verification on her behalf pursuant to 28 U.S.C. § 2242.

I have read the foregoing Petition, and the factual allegations are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on October 2, 2026, at Los Angeles, California.

/s/ Emily L. Robinson
Emily L. Robinson